UNITED STATES of America

v.

Roland J. BAILEY, Appellant.

UNITED STATES of America

v.

Candisha Summerita ROBINSON a/k/a
Candysha Robinson, Appellant.

Nos. 90–3119, 92–3062.

United States Court of Appeals,
District of Columbia Circuit.

Argued In Banc March 30, 1994.

Decided Oct. 4, 1994.

James G. Duncan (appointed by the court) argued the cause and filed the briefs, for appellant Bailey.

David B. Smith (appointed by the court) argued the cause and filed the briefs, for appellant Robinson.

John R. Fisher, Asst. U.S. Atty., argued the cause for appellee. With him on the brief were Eric H. Holder, Jr., U.S. Atty., and Elizabeth H. Danello, Asst. U.S. Atty.,

Elizabeth Trosman, Odessa F. Vincent, Thomas C. Black, and William E. Lawler, III, Asst. U.S. Attys., entered appearances.

Before EDWARDS, Chief Judge, WALD, MIKVA,* SILBERMAN, BUCKLEY, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Dissenting opinion filed by Circuit Judge WALD.

Dissenting opinion filed by Circuit Judge STEPHEN F. WILLIAMS, in which Circuit Judges SILBERMAN and BUCKLEY concur.

Separate dissenting statement filed by Circuit Judge SILBERMAN.

GINSBURG, Circuit Judge:

This consolidated case involves two separate challenges, one by appellant Roland Bailey and one by appellant Candisha Robinson, to their convictions under 18 U.S.C. § 924(c)(1). In relevant part, that section imposes a five-year term of imprisonment upon anyone who "during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm." We have long required that in order to support a conviction under § 924(c)(1), the government must demonstrate both a "nexus ... between a particular drug offender and the firearm," *United States v. Long,* 905 F.2d 1572, 1577 (D.C.Cir.1990), and that "the gun facilitate[d] the predicate offense in some way," *United States v. Jefferson,* 974 F.2d 201, 205 (D.C.Cir.1992). In order to assess whether the government has made the required showing, we have developed an open-ended test that takes account of numerous factors arguably relevant to whether a gun was used in relation to a drug trafficking offense. *See, e.g., United States v. Derr,* 990 F.2d 1330, 1338 (D.C.Cir.1993); *United States v. Morris,* 977 F.2d 617, 621–22 (D.C.Cir.1992). Applying this test, divided panels of the court

affirmed Bailey's conviction, *see United States v. Bailey,* 995 F.2d 1113 (D.C.Cir. 1993), and reversed Robinson's conviction, *see United States v. Robinson,* 997 F.2d 884 (D.C.Cir.1993).

Because this complex, open-ended test has produced widely divergent results and because we believe that it intrudes the court into the province of the jury, we now replace it with a test that looks to two factors only: the proximity of the gun to the drugs involved in the underlying offense, and the accessibility of the gun to the defendant from the place where the drugs, drug paraphernalia, or drug proceeds are located. Applying that test, we affirm both convictions.

## I. BACKGROUND

In each of these cases, possession with the intent to distribute cocaine was the predicate drug offense in connection with which the defendant was charged with using or carrying a firearm in violation of § 924(c)(1). The facts of each case are briefly as follows.

### A. *United States v. Bailey*

In May 1989, Roland Bailey was stopped by two Metropolitan Police officers after they noticed that the car he was driving had no front license plate and no inspection sticker. When Bailey failed to produce a driver's license, the officers ordered him out of the car. Before Bailey exited the car, the officers saw him push something between the seat and the front console. Upon searching the passenger compartment of the car they discovered one round of ammunition and 27 small plastic bags containing a total of 30 grams of cocaine. The officers then placed Bailey under arrest; the ensuing search of the trunk of his car turned up a loaded 9–mm. pistol and $3,216 in cash.

Bailey was charged with one drug offense and one other firearms offense in addition to using or carrying a firearm in violation of 18 U.S.C. § 924(c)(1). At trial, Detective Charles DiDomenico, a narcotics expert, tes-

---

* Then–*Chief Judge* MIKVA, a member of the Court when these cases were argued *in banc,* took no part in the disposition.

tified that weapons such as Bailey's are frequently carried by drug dealers "not only to protect themselves, but [also] to protect their assets, drugs and money." Bailey was convicted by the jury on all charges and was sentenced by the court to two concurrent 51–month sentences of imprisonment on the drug and weapon charges not at issue here, and to a consecutive 60–month term of imprisonment on the § 924(c)(1) conviction.

### B. United States v. Robinson

In June 1991, an undercover officer of the Metropolitan Police Department approached Veloria Robinson, the sister of appellant Candisha Robinson, and told her that he wanted to buy crack cocaine. Veloria then took him to an apartment in the northeast quadrant of the city. Candisha opened the door; Veloria told her that the officer wanted something. When Candisha asked what he wanted, he replied that he wanted a "twenty." He then entered the apartment and the Robinson sisters went into the bedroom. He saw Candisha hand Veloria a rock of crack cocaine, which Veloria then sold to him. The next evening, the officer made another controlled buy at the same apartment, this time from a man who claimed that he also lived there.

Shortly after the second controlled buy, a search warrant was executed at the apartment. Inside a locked trunk in the bedroom closet the police found a .22–caliber Derringer, appellant Robinson's 1990 tax return, a letter from her employer, 10.88 grams of crack cocaine, and the marked $20 bill from the first controlled buy. They also found a quantity of plastic baggies in the bedroom.

At trial, Detective David Stroud, a narcotics expert, testified that the Derringer was a "second gun"—that is, a type of gun that a drug dealer might hide on his person for use until he could get to his "real gun." Stroud also testified that drug dealers generally use guns to protect themselves from other drug dealers, the police, and their own employees.

Robinson was convicted by a jury on five separate drug counts as well as on the § 924(c)(1) charge. Including the 60–month term of imprisonment for violating § 924(c)(1), she was sentenced to 157 months

of imprisonment, four years of supervised release, and a special assessment of $300.

### C. The Appeals in Bailey and Robinson

Each defendant appealed his or her § 924(c)(1) conviction on the ground that the Government had failed to adduce sufficient evidence at trial that he or she had "used" or "carried" a firearm in relation to a drug offense. Different panels affirmed Bailey's conviction and reversed Robinson's, in each case over a dissent. Bailey and the government respectively suggested rehearing *in banc*. In order to resolve the apparent inconsistencies in our various decisions applying § 924(c), we consolidated the two cases and reheard them *in banc*.

### II. ANALYSIS

 Section 924(c)(1) states that:

> Whoever, during and in relation to any ... drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment for such ... drug trafficking crime, be sentenced to imprisonment for five years.

By requiring that the use of the firearm be "in relation to" a drug trafficking offense, the Congress made it clear that it did not intend to criminalize the mere possession of a firearm by someone who commits a drug offense. "[T]he firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence." *Smith v. United States,* — U.S. —, ———, 113 S.Ct. 2050, 2058–59, 124 L.Ed.2d 138 (1993). At the same time, it is clear that a firearm need not actually be brandished in order to be used or carried in connection with a drug trafficking offense. *United States v. Evans,* 888 F.2d 891, 896 (D.C.Cir.1989). As Justice (then Judge) Kennedy wrote for the Ninth Circuit in the seminal opinion on § 924(c)(1):

> If the firearm is within the possession or control of a person who commits an underlying crime as defined by the statute, and the circumstances of the case show that the firearm facilitated or had a role in the crime, such as emboldening an actor who had the opportunity or ability to display or

discharge the weapon to protect himself or intimidate others, whether or not such display or discharge occurred, then there is a violation of [the statute].

*United States v. Stewart,* 779 F.2d 538, 540 (9th Cir.1985) (internal citations omitted).

## A. Section 924(c)(1) to Date

In an effort to distinguish between mere possession of and the use or carrying of a gun in connection with a drug trafficking crime, we held early on that more than just evidence of proximity was required to establish "that the gun supported the possession crime." *United States v. Bruce,* 939 F.2d 1053, 1055 (D.C.Cir.1991). By the next year, we were able to state that "a number of factors" may be relevant in any particular case: "courts have identified and will [continue to] identify" such factors. *United States v. Morris,* 977 F.2d 617, 621 (D.C.Cir.1992). Just two years later Judge Wald summarized the development of our case law this way:

> [W]e have enumerated a nonexclusive set of factors to weigh in making that [distinction]. Among other things, we look to whether a gun is accessible to the defendant, whether it is located in proximity to the drugs (which may cut either way depending on the facts of a particular case), whether it is loaded, what type of weapon it is, and, finally, whether there is expert testimony to bolster the government's particular theory of "use."

*Derr,* 990 F.2d at 1338 (citing *Morris,* 977 F.2d at 621–22). Thus, in each case in which a defendant challenges the sufficiency of the evidence for his conviction under § 924(c)(1), we have weighed each bit of evidence against him in order to determine whether the defendant could be said to have used (or carried) his gun in furtherance of his drug crime.

Defendants Bailey and Robinson do not attack this open-ended (for convenience *Bruce–Morris–Derr*) approach in determining whether a gun was used during and in relation to a drug trafficking offense. Nor do they question the prior holding of this (and other) court(s) that a gun need not be brandished or displayed in order to be used or carried. Instead, each argues that if this approach were properly applied, he or she could not have been convicted based upon the evidence presented at trial. In response, the government argues that it needs to present evidence only that the defendant possessed a firearm and that the firearm in some way facilitated the drug crime; thus implicitly the Government asks us to abandon the *Bruce–Morris–Derr* approach in favor of a simpler test.

In form the dispute between the parties is little more than a disagreement over the evidence necessary to sustain a § 924(c)(1) conviction; neither side expressly addresses the question of how the disputed element of the crime, *viz.* "use," ought be defined. In substance, however, this case is about what constitutes use, as opposed to mere possession, of a firearm. Only when we have resolved that question can we determine the quantum of evidence necessary to convict and formulate an appropriate test for assessing whether the government has produced that evidence.

We granted rehearing in order to revisit these issues in the light of our experience using the *Bruce–Morris–Derr* approach. We do so bearing in mind that because the *Bruce–Morris–Derr* approach represents the established law of the circuit, a due regard for the value of stability in the law requires that we have good and sufficient reason to reject it at this late date. *See McKinney v. Pate,* 20 F.3d 1550, 1565 n. 21 (11th Cir.1994) (*in banc*) (noting that although "the implications of *stare decisis* are less weighty" when an *in banc* court reviews an issue for the first time, "*stare decisis* is a hallmark of our judicial system" and should still be considered by the court *in banc*). In particular, we reconsider our own prior construction of a statute somewhat gingerly as well because " 'unlike in the context of constitutional interpretation ... Congress remains free to alter what we have done.' " *Critical Mass Energy Project v. Nuclear Regulatory Commission,* 975 F.2d 871, 875 (D.C.Cir.1992) (*in banc*) (quoting *Patterson v. McLean Credit Union,* 491 U.S. 164, 172–73, 109 S.Ct. 2363, 2370, 105 L.Ed.2d 132 (1989) (internal citations omitted)); *see also Cottrell v. Commissioner,* 628 F.2d 1127, 1131 (8th Cir.1980) (*in banc*) ("The doctrine of *stare decisis,* weighty in

any context, is especially so in matters of statutory construction.").

We have nonetheless identified at least three factors that justify rejecting established precedent. First, the *in banc* court may properly overrule a prior panel decision if "it decides that the panel's holding on an important question of law was fundamentally flawed." *Critical Mass Energy Project,* 975 F.2d at 876. In this regard, we conclude below that the open-ended *Bruce–Morris–Derr* approach impermissibly intrudes into the province of the jury. Second, when "a precedent [is] a positive detriment to coherence and consistency in the law ... because of inherent confusion created by an unworkable decision," the court is justified in overruling that precedent. *Patterson,* 491 U.S. at 173, 109 S.Ct. at 2371. In this case, even a brief survey of our decisions demonstrates (below) that the *Bruce–Morris–Derr* approach has produced and will likely continue to produce inconsistent results. Finally, the *in banc* court may overrule a prior precedent interpreting a statute "if it finds that other circuits have persuasively argued a contrary construction." *Critical Mass Energy Project,* 975 F.2d at 876. Again, a survey of the other circuits (also below) demonstrates that they have uniformly adopted a standard different from ours and one that seems more conducive to consistent application.

■ Preliminarily, therefore, we survey the problems inherent in the *Bruce–Morris–Derr* approach: intrusion into the province of the factfinder, seemingly inconsistent results, and a continuing conflict with the interpretation of § 924(c)(1) adopted by virtually every other circuit.

*1. The Province of the Jury*

■ It is a cardinal principle of our system of criminal law that the facts are settled by the trier of fact, be it a jury or a judge, and are not ordinarily to be redetermined by a reviewing court. On appeal from a general verdict finding a defendant guilty, the deference we owe to the trier of fact requires that we draw from the record all inferences that can justifiably be drawn in support of the conviction. Hence, in assessing the sufficiency of the evidence, as an appellate court we must ask not "whether [we] believe[ ] that the evidence at the trial established guilt beyond a reasonable doubt, but whether the judgment was supported by substantial evidence." *Woodby v. Immigration & Naturalization Service,* 385 U.S. 276, 282, 87 S.Ct. 483, 486, 17 L.Ed.2d 362 (1966). Or, as the Supreme Court said in *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. at 2789 (emphasis in original); *see also United States v. Long,* 905 F.2d 1572, 1576 (D.C.Cir. 1990) ("A jury is entitled to draw a vast range of reasonable inferences from evidence, but may not base a verdict on mere speculation").

■ Whether a gun was used during and in relation to a drug trafficking offense is, at its core, a question of fact. In a case where the gun was not actually fired or brandished during the commission of the crime, it may well be an ultimate rather than a basic fact, but it is still a question of fact and not of law. Of course, an appellate court may properly determine, as a matter of law, the baseline or minimum conduct that can constitute a "use," and it must determine in each case, with appropriate deference to the jury, whether the record contains sufficient evidence of such conduct. The reviewing court does not sit, however, to make its own finding with respect to an ultimate fact. Weighing the evidence is a function assigned to the jury: "We are not a second jury weighing the evidence anew and deciding whether or not we would vote to convict the defendant." *United States v. Poston,* 902 F.2d 90, 94 (D.C.Cir.1990). Yet the use of an approach that requires the court to weigh numerous factors and to determine the specific relevance of individual facts in order to assess the sufficiency of the evidence invites the court to do just that.

The *Bruce–Morris–Derr* approach strips from the jury its "responsibility [as] the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw

reasonable inferences from basic facts to ultimate facts." *Jackson*, 307 U.S. at 319, 99 S.Ct. at 2789. For example, in *United States v. Bruce*, 939 F.2d 1053 (D.C.Cir.1991), we were at considerable pains to determine whether a small gun found in the pocket of a coat along with a stash of drugs "was intended for use only at the time of distribution" or was rather "the sort of weapon a drug dealer would employ for protection against an effort to penetrate a crack house." *Id.* at 1055. Determining that the former was more likely true, we reversed the conviction. *See id.* at 1056. Similarly, in *Derr* and *Robinson*, the panel struggled to determine for itself the significance of the fact that the defendant's gun was locked respectively in a closet or trunk with a stash of drugs at the time of the defendant's arrest. *See Robinson*, 997 F.2d at 888; *Derr*, 990 F.2d at 1338. Determining the weight to be given a single piece of evidence is not ordinarily an appropriate function for an appellate court.

A due regard for the limits that the jury system necessarily places upon the scope of our review would not lead us to abdicate all our responsibility as an appellate court—for example by affirming any conviction in which a gun is found and there is some connection, no matter how speculative or remote, between the gun and the predicate drug offense. A jury may convict a defendant for any of a number of impermissible reasons, and therefore, if the defendant claims that the evidence against him is insufficient to sustain his conviction, we must as an appellate court review the record conscientiously. *See United States v. Zeigler*, 994 F.2d 845, 849 (D.C.Cir.1993). Nor does our recognition that the approach heretofore used in this circuit impinges upon the province of the jury by itself predetermine precisely how we ought to review a § 924(c)(1) case. It does, however, strongly suggest that we must replace the open-ended *Bruce–Morris–Derr* approach with a manageable standard; we must, that is, state clearly the minimum showing that the government must make in order to put to the jury the question whether a defendant has violated § 924(c)(1).

## 2. Inconsistent Results

The open-ended approach described in *Derr* has produced widely divergent and seemingly contradictory results. Panels have upheld convictions where a loaded, sawed-off shotgun was found along with crack cocaine and drug paraphernalia in a lawn clipping bag beneath the exterior stairwell of a house and additional drugs and paraphernalia were found in the defendant's bedroom, *see United States v. Jefferson*, 974 F.2d 201 (D.C.Cir.1992); where loaded pistols were found underneath a sofa cushion and on a bedroom nightstand in the defendant's house, which elsewhere contained crack cocaine in ziplock bags and other drug paraphernalia, *see United States v. Morris*, 977 F.2d 617 (D.C.Cir.1992); and where a loaded 9–mm. pistol was found along with cash in the trunk of the defendant's car after bags of cocaine had been found in the front seat of the car, *see United States v. Bailey*, 995 F.2d 1113 (D.C.Cir.1993). In contrast, panels have reversed convictions where a loaded .22 caliber Derringer was found, along with individual packages of cocaine and marijuana, in a pocket of the defendant's trench coat in the house in which he lived, *see United States v. Bruce*, 939 F.2d 1053 (D.C.Cir.1991); where an unloaded .357 Magnum revolver was found along with the defendant's birth certificate and a locked box containing cash, crack cocaine, and drug paraphernalia in an apartment in which the defendant was staying, *see United States v. Derr*, 990 F.2d 1330 (D.C.Cir.1993); and where an unloaded .22 caliber Derringer was found in a closet along with crack cocaine and drug proceeds, including marked money, *see United States v. Robinson*, 997 F.2d 884 (D.C.Cir.1993). Although each of these cases can be distinguished on the basis of one or another fact—for example, by looking to the type of gun involved or to how easily the defendant could have grabbed the gun at the time that he was arrested—such distinctions seem counter-intuitive if not arbitrary. Having reflected upon our experience, we think it apparent that the court has failed to take a consistent approach because it has not laid down a standard that yields determinate results in any but the easiest of cases.

### 3. Conflict with Other Circuits

No other circuit has found our open-ended approach persuasive. Our sister circuits have each adopted a definition of "use" that is considerably broader than firing, displaying, or otherwise brandishing the firearm. They focus upon whether the evidence concerning the location of the gun is sufficient to permit the jury to conclude that the gun in some way facilitated the predicate drug trafficking offense. From a functional perspective, the standards they have developed for assessing the sufficiency of the evidence are much more similar to the "proximity and accessibility" standard we adopt today than to the open-ended approach that we have used in the past.

The opinion in *United States v. Molinar–Apodaca*, 889 F.2d 1417 (5th Cir.1989) is representative. In that case, police officers executing a search warrant had found a commercial quantity of marijuana in a shed outside the defendant's house; in the house itself, they found an automatic rifle and a semi-automatic handgun. *Id.* at 1422. In analyzing the defendant's challenge to the sufficiency of this evidence, the Fifth Circuit did not look at such details as whether the guns were loaded or whether they were the appropriate type of weapon to protect an ongoing drug operation. Rather, applying circuit law to the effect "that the government is only obliged to show that the firearm was available to provide protection to the defendant in connection with his engagement in drug trafficking," the court affirmed the conviction.

In the wake of Justice Kennedy's analysis in *Stewart*, the Ninth Circuit applies an equally straightforward test. That court will affirm a conviction under § 924(c)(1) "if [the firearm's] physical proximity to the defendant at any time during the commission of the crime, or during arrest, supports the inference that it emboldened him to commit the underlying offense or to resist arrest." *United States v. Torres–Medina*, 935 F.2d 1047, 1050 (9th Cir.1991).

Every other circuit similarly focuses, in essence, upon whether the firearm was accessible and proximate to the defendant during the commission of the drug offense. In numerical order by circuit, *see, e.g., United States v. Paulino*, 13 F.3d 20, 26 (1st Cir. 1994) ("[T]he court's critical concern should ... be whether ... [the firearm] was 'available for use' in connection with the narcotics trade"); *United States v. Medina*, 944 F.2d 60, 66 (2d Cir.1991) (holding that a conviction may be affirmed "where circumstances indicate that the defendant intended to use the weapon by strategically placing it so that it could be available for use during a drug transaction"); *United States v. Hill*, 967 F.2d 902, 906–07 (3d Cir.1992) (holding that where the proximity of the gun to the drugs indicated that the defendant's "access to the weapon was unimpeded by distance or other objects," the jury could conclude that the weapon "facilitated [the defendant's] possession of and intention to distribute" illegal drugs); *United States v. Paz*, 927 F.2d 176, 179 (4th Cir. 1991) (affirming a conviction because, during the course of defendant's possessory offenses, "the gun was present and accessible, even though under a mattress"); *United States v. Thomas*, 12 F.3d 1350, 1362 (5th Cir.1994) ("The presence of firearms at the home of a defendant where drugs, money, and ammunition are also found ... is sufficient to establish the 'use' of a firearm as an integral part of a drug-trafficking crime in violation of § 924(c)(1)"); *United States v. Warner*, 10 F.3d 1236, 1239 (6th Cir.1993) (affirming a conviction solely because the firearm was "readily accessible for drug-related protection"); *United States v. Vasquez*, 909 F.2d 235, 240 (7th Cir.1990) (holding that a conviction under § 924(c)(1) is appropriate when guns and drugs are present in the same location, because the "trier of fact [can] reasonably conclude that the availability of firearms instills [in the defendant] a heightened sense of security [while] he posses[es] the drugs with the intent to distribute them"); *United States v. Quintanilla*, 25 F.3d 694, 700 (8th Cir.1994) ("To support a conviction under section 924(c)(1), the government need only establish that a firearm was present and available for use"); *United States v. Torres–Medina*, 935 F.2d 1047, 1050 (9th Cir.1991) ("We hold that a firearm may be considered available [and therefore used by a defendant] for purposes of section

924(c)(1) if its physical proximity to the defendant at any time during the commission of the crime, or during arrest, supports the inference that it emboldened him to commit the underlying offense or to resist arrest"); *United States v. McKinnell,* 888 F.2d 669, 675 (10th Cir.1989) (holding that "the uses element of section 924(c)(1) is satisfied when the defendant has ready access to the firearm and the firearm was an integral part of his criminal undertaking and its availability increased the likelihood that the criminal undertaking would succeed" (internal quotation marks omitted)); *United States v. Poole,* 878 F.2d 1389, 1393 (11th Cir.1989) ("[P]ossession of a firearm constitutes use in relation to the drug trafficking offense if the possession is an integral part of, and facilitates the commission of, the drug trafficking offense"); *see also* Note, *Smith v. United States and the Modern Interpretation of 18 U.S.C. 924(c)(1): A Proposal to Amend the Federal Armed Offender Statute,* 69 NOTRE DAME L.REV. 815, 843 & nn. 187–190 (1994) (noting that "other circuits have specifically rejected many of the factors considered by the D.C.Circuit: size of the gun ... whether the firearm was loaded, number of weapons, and evidence of past actual use"). *But cf. United States v. Taylor,* 18 F.3d 55, 58 (2d Cir.1994) (noting that the analysis of a sufficiency challenge "is clearly a very fact-intensive question [that] requir[es] a careful examination of, among other things, where the gun was located and what else was found in the apartment").

## B. Section 924(c) Henceforth

As the Supreme Court has made clear, the government must make two distinct showings in order to obtain a conviction under § 924(c)(1): "that the defendant 'use[d] or carrie[d] a firearm'" and "that the use or carrying was 'during and in relation to'" a predicate offense. *Smith v. United States,* — U.S. —, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993). Therefore, in determining what the proper standard should be, we must determine both what constitutes the use or carrying of a gun and in what circumstances such a use or carrying is in relation to a drug trafficking offense.

### 1. "Use" of a Firearm

In the context of § 924(c)(1), "use" could be defined either narrowly, so as to encompass only the paradigmatic uses of a gun, i.e., firing, brandishing, or displaying the gun during the commission of the predicate offense, or more broadly, so as to include the other ways in which a gun can be used to facilitate drug trafficking. The narrow definition has the virtue of simplicity; it is, after all, relatively easy to determine whether the defendant's firing, brandishing, or displaying a gun was related to the defendant's contemporaneous (recall the "during" requirement of § 924(c)(1)) drug trafficking offense. The narrow definition also has the vice of simplicity, however; it is too narrow to capture all of the various uses of a firearm that the Congress apparently intended to reach via § 924(c)(1).

Certainly nothing in the statute indicates that the Congress intended to exclude any use from the scope of its prohibition. Indeed, the Supreme Court has said that in § 924(c)(1), the "Congress employed the term 'use' expansively." *See Smith,* — U.S. at —, 113 S.Ct. at 2058. Wherefore, it held that the statute prohibits the "use" of a firearm even as an object that can be bartered for drugs. *See Smith,* — U.S. at —, —, 113 S.Ct. at 2055, 2057.

Like firing, brandishing, or displaying a gun, barter involves handling the gun. A gun can surely be used even when it is not being handled, however. For example, a gun placed in a drawer beside one's bed for fear of an intruder would, in common parlance, be a gun "used" for domestic protection.

This more inclusive understanding of "use" has long been recognized in the jurisprudence of the Supreme Court. In *Astor v. Merritt,* 111 U.S. 202, 4 S.Ct. 413, 28 L.Ed. 401 (1884), the Court was required to interpret a customs statute that exempted from duty "[w]earing apparel in actual use ... of persons arriving in the United States." *Id.* at 203, 4 S.Ct. at 413. The petitioner sought an exemption for clothing that he and his family had purchased abroad, but not yet worn. The Court accepted his argument:

> If a person residing in the United States should purchase wearing apparel here, in a

condition ready for immediate wear without further manufacture, intended for his own use or wear, suitable for the immediately approaching season of the year, and not exceeding in quantity, quality or value the limit above mentioned, no one would hesitate to say that such wearing apparel was 'in actual use' by such person, even though some of it might not have been actually put on or applied to its proper personal use.... An article of wearing apparel, bought for use, and appropriated and set apart to be used, by being placed in with, and as a part of, what is called a person's wardrobe, is, in common parlance, in use, in actual use, in present use, in real use, as well before it is worn as while it is being worn or afterwards.

*Id.* at 213, 4 S.Ct. at 419. Likewise, in *Smith,* the Court noted with approval the following definition of the verb "to use": " '[t]o make use of; to convert to one's service; to avail oneself of; to utilize; to carry out a purpose or action by means of.' " *Id.* ⸺ U.S. at ⸺, 113 S.Ct. at 2054 (quoting BLACK'S LAW DICTIONARY 1541 (6th ed. 1990)).

▆▆▆ In the context of § 924(c)(1), therefore, we hold that one uses a gun, i.e., avails oneself of a gun, and therefore violates the statute, whenever one puts or keeps the gun in a particular place from which one (or one's agent) can gain access to it if and when needed to facilitate a drug crime. In a case where the predicate offense involves the distribution of drugs, the government must show that the defendant had the gun in such a place at the time that the drugs were being distributed. In a case when the predicate offense is possession with the intent to distribute drugs, however, the government need not prove that the gun was in that place during the entire period that the defendant illegally possessed the drugs or that it was in that place at the time that the defendant was arrested. Because possession with the intent to distribute is a continuing offense—that is, an offense that extends through time—the government need only prove that the defendant put or kept the gun in that place at some point while the defendant illegally possessed the drugs.[1]

### 2. "During" and "In Relation To"

▆▆▆ Once it is determined that the defendant has used or carried a gun, the more difficult question is whether he has done so "in relation to a drug trafficking offense." As the Court noted in *Smith,* this requirement "at a minimum, means that the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence." ⸺ U.S. at ⸺, 113 S.Ct. at 2059. For the statute to be violated, therefore, the gun "must 'facilitat[e] or ha[ve] the potential of facilitating' the drug trafficking offense." *Id.* (quoting *Stewart,* 779 F.2d at 540) (alterations in original). Using a gun to protect one's drugs, drug paraphernalia, or the proceeds of one's drug sales is therefore clearly a prohibited use of the gun. Our prior decisions under § 924(c)(1) recognize as much.

The First Circuit refers to this relationship quite generally as a "facilitative nexus." That court looks only to whether the gun was "kept [where it was] to be available for use" in an ongoing drug offense. *See, e.g., United States v. Paulino,* 13 F.3d 20, 26 (1st Cir. 1994). The court's rationale is readily explained: once a person acquires a firearm and puts or keeps it where it can be used more actively in his drug activity, that firearm becomes a part of the drug activity and thus is used by the defendant in relation to the drug activity. It matters little whether the use is described in terms of emboldening

---

1. Invoking *United States v. Ray,* 21 F.3d 1134 (D.C.Cir.1994), and the Solicitor General's brief in *McLaughlin v. United States,* 476 U.S. 16, 106 S.Ct. 1677, 90 L.Ed.2d 15 (1986), the dissent proposes that one may "use" a firearm in connection with a drug trafficking offense only by displaying it or, if the weapon is concealed, by threatening to use it. Judge Williams' Dissenting Opinion pp. 123–25. This ignores that how one "uses" a weapon in a crime necessarily depends upon the nature of the crime. *Ray* and *McLaughlin* were aggravated bank robbery cases, interpreting 18 U.S.C. § 2113(d). Of course one must somehow threaten another with a dangerous weapon in order to commit that offense. But it is senseless to say the same of crimes involving possession of drugs. Those are furtive crimes. Stealth is essential to their success. If, as expected, the drugs are secreted, one should expect the firearm to be as well.

the defendant to commit the drug trafficking crime, *see, e.g., Stewart,* 779 F.2d at 540, protecting the defendant's possessory interest in his drugs, *see, e.g., United States v. Young–Bey,* 893 F.2d 178, 181 (8th Cir.1990), or otherwise; any way one puts it, the firearm is being used as part of the drug activity. Therefore, like the First Circuit, we look to whether the gun was positioned so as to be available for use during ongoing drug activity in order to determine whether the use was within the scope of § 924(c)(1).

Note that in order to relate to a drug trafficking offense, the use of the gun need not actually have furthered the offense. As the Supreme Court said in *Smith,* the gun need only "ha[ve] the potential of facilitating" the drug trafficking offense. Indeed, the Supreme Court has consistently held that "[t]he ordinary meaning of the words ['relating to'] is a broad one—'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Morales v. Trans World Airlines, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157 (1992) (quoting BLACK'S LAW DICTIONARY 1158 (5th ed. 1979)); *see also District of Columbia v. Greater Washington Board of Trade,* —— U.S. ——, ——, 113 S.Ct. 580, 583, 121 L.Ed.2d 513 (1992) (noting that when the Congress uses the phrase "relates to," it has chosen " 'deliberately expansive' language" (quoting *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 47, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987))). The Congress's use of that phrase here was clearly deliberate and an indication that it intended § 924(c)(1) to be a broad prohibition, reaching more than conduct that actively advances the underlying predicate drug offense.

The legislative history of § 924(c)(1) reveals that the Congress expressly retained the "in relation to" requirement in preference to a more restrictive "in furtherance of" requirement. One bill that passed the Senate as part of the legislative process that culminated in the enactment of the current version of § 924(c)(1) would have penalized "[w]hoever, during and in relation to any [one of a number of enumerated drug] felon[ies] . . . uses a firearm, or carries a fire-

arm in furtherance of such crime. . . ." 131 Cong.Rec. 18,155, 18,235 (July 9, 1985) (reprinting S.49, a predecessor bill, as passed by the Senate). The Bureau of Alcohol, Tobacco, and Firearms criticized this proposal, however. Referring to the then-current version of § 924(c)(1), it argued that because "existing law already requires that the carrying be 'in relation to' the underlying crime," the proposed bill would "weaken[ ] the existing mandatory penalty provision." 4 U.S.C.C.A.N. 1327, 1346 (1986). Therefore, the "in furtherance of" requirement was deleted. This suggests that the Congress carefully avoided any implication that it intended to narrow the relationship that must be shown between the gun and the predicate offense in order to support a conviction under § 924(c)(1).

■ In sum, it is apparent that positioning a firearm in such a way that it protects or is otherwise integrated into one's drug trafficking is not just a use of that gun, but is a use of that gun in relation to a drug trafficking offense and is therefore covered by the statute. What, then, is sufficient evidence that a gun found at the scene of a drug crime is being used in this way?

■ Whenever there is sufficient evidence for a jury to find that the defendant at some time during the commission of the predicate drug offense put or kept a firearm in a place where it would be proximate to and accessible from a place that is clearly connected to his drug trafficking (*e.g.,* a place used to store, manufacture, or distribute drugs, or to keep the proceeds of drug transactions), the jury may also infer that the gun was being used to protect the drug trafficking operation, and was therefore being used in violation of § 924(c)(1). We emphasize that the jury may draw this inference regardless whether the predicate offense is one of drug distribution or of possession with intent to distribute drugs; we reject any suggestions to the contrary in our prior opinions. *Cf. Bruce,* 939 F.2d at 1055 ("Since possession with intent subsequently to distribute is in a sense a passive crime, it becomes somewhat difficult analytically to determine how one goes about using a gun in

relation to that crime"). As the Eighth Circuit has stated:

> It has become common knowledge that drug traffickers typically keep firearms available to protect themselves and their drugs and drug money. The presence and the availability of the firearms are often crucial to the "success" of the drug enterprise. It is therefore permissible for juries to infer that firearms found among a drug trafficker's paraphernalia are used to further the drug venture and are thus used during and in relation to drug trafficking within the meaning of section 924(c)(1).

*United States v. Young–Bey*, 893 F.2d 178, 181 (8th Cir.1990).

Obviously, a defendant is free to present evidence that he possessed the gun solely for a different purpose—for example, as part of a collection of guns that just happened to be kept in a place that later became involved in drug trafficking. *See, e.g., United States v. Vincent*, 20 F.3d 229, 234–35 (6th Cir.1994) (noting that defendant had argued that he was a gun collector); *United States v. Morrow*, 923 F.2d 427, 435 (6th Cir.1991) (noting that defendant had "strenuously argued at trial that the only purpose for the gun was to shoot snakes"). It will be the duty of the trier of fact, however, and emphatically not of this court, to weigh all such evidence and to determine whether, as a matter of fact, the weapon was being used as part of a drug trafficking operation.

This test for use is not only an accurate means of ensuring that the scope of § 924(c)(1) is as broad as the Congress intended it to be; it will also avoid the problems with the *Bruce–Morris–Derr* approach that we outlined above. First, as we have already noted, placing or keeping a gun in such a way that it protects a drug trafficking operation is clearly a "use" of a gun "in relation to a drug trafficking offense." In most cases, the gun's proximity to and accessibility from the actual site of the defendant's drug trafficking will be the most probative evidence that the defendant was using the firearm to protect his drug trafficking. Similarly, whether the defendant carried the gun with, or to or from the location of, the drugs will be the most probative evidence that he

carried it during and in relation to a drug trafficking offense. Second, this test can be readily administered both by the district court, which must determine whether the Government's case may go to the jury, and by the appellate panel that must determine whether the evidence was sufficient to support a conviction under § 924(c)(1). As such, it will assure greater uniformity across cases while penalizing more precisely the conduct that the Congress intended to reach.

## C. Application of the Standard

■ Applying the standard for "use" to the present cases, we hold that the Government presented sufficient evidence to convict both Bailey and Robinson. When Bailey was arrested, there were 30 grams of cocaine, more than $3,200 in cash, and a loaded 9–mm. pistol in his car. He was properly convicted of possession with the intent to distribute the cocaine. Because the gun was found in the same place as the cash (namely, the trunk) and in the same car as the drugs that formed the basis of his drug trafficking conviction, the jury was entitled to infer that the money was the proceeds of an ongoing drug operation. The requirements of proximity and accessibility were both satisfied. The gun was proximate to the drugs and was easily accessible to Bailey at any time that he was handling either the drugs or the proceeds of their sale. The jury could reasonably infer that Bailey had intentionally incorporated the gun into his drug operation, was using it as part of that operation, and was therefore using it in relation to his possession with intent to distribute the drugs. Although the record does not demonstrate that Bailey had made a specific drug sale (the amount of money he had notwithstanding), there is little reason to doubt that he was using the gun in relation to the possessory offense regardless whether the gun actually furthered the possessory offense or emboldened him to commit that offense. It is enough that the jury was entitled to conclude that Bailey had put the gun into the car not for some unrelated purpose but because he was keeping drugs there; that alone establishes that the gun was used in relation to

Bailey's drug trafficking offense. We therefore affirm his conviction.

■ The same analysis requires that we affirm Robinson's conviction. In her case, the firearm was found in the same locked trunk as were the drugs that formed the basis of her conviction for possession with intent to distribute. Again, the requirements of proximity and accessibility are obviously satisfied: The gun was proximate to the drugs, and it was accessible to anyone, such as Robinson, who had access to the drugs. Because the jury found beyond a reasonable doubt that the drugs were Robinson's—a finding not at issue here—it could also infer from these facts that Robinson placed or kept the gun in the same location as the drugs in order to protect her possession of the drugs. Hence, the jury was entitled to conclude that Robinson used the gun in relation to the drug trafficking offense.

### III. CONCLUSION

■ In sum, we reject the open-ended *Bruce–Morris–Derr* approach and conclude instead that in order to survive a challenge to the sufficiency of the evidence for a conviction under § 924(c)(1), the Government need only point to evidence that the firearm in question was in proximity to the drugs, drug paraphernalia, or drug proceeds and was accessible to the defendant from the site of the drugs, drug paraphernalia, or drug proceeds involved in his or her predicate drug trafficking offense. When there is evidence of proximity and accessibility, we will affirm a conviction under § 924(c)(1). Because the government presented such evidence at the trials of both Bailey and Robinson, the judgments of conviction in each case are

*Affirmed.*

WALD, Circuit Judge, dissenting:

There are four reasons why I believe the majority's bright line test for determining whether a gun has been "used" to commit a drug offense is wrong. First: Although I agree that "use" under 18 U.S.C. § 924(c)(1) requires the government to show that the gun in some way "facilitated" the defendant's commission of the underlying drug offense,

*see United States v. Jefferson,* 974 F.2d 201, 205 (D.C.Cir.1992), the sticking point is what kind of evidence it takes to make that showing. The *Bruce–Morris–Derr* line of cases did not in that sense set forth any test or formula for making such a determination; rather, it provided only a list of potentially relevant factors, *i.e.,* the type of weapon involved, whether it was loaded, the presence of expert testimony to support the government's theory of "use," the proximity of the gun to the drugs, and the accessibility of the gun to the defendant. By focusing on only two of the factors—(1) proximity of guns to drugs, drug paraphernalia, or drug proceeds and (2) accessibility of the guns to the defendant from a place used to store drugs, drug paraphernalia, or drug proceeds—to the exclusion of any other relevant factors, the majority in my view diminishes rather than enhances the prospect of accurate assessment on a case-by-case basis as to whether the gun was used to facilitate the drug offense. Congress, it should be noted, created no statutory presumption that "use" automatically would follow from the presence of any particular factors, and I can find no authority for courts to do so.

Rather than furnishing a clear and predictable guide for judges and juries, the majority's new "proximity and accessibility" test offers only a straightjacket from which judges must inevitably strain to escape, as they are confronted with a steady stream of new fact situations. But the circumstances at which they must look to justify any exception will almost certainly be the very factors mentioned in the much-maligned *Bruce–Morris–Derr* cases, *i.e., United States v. Bruce,* 939 F.2d 1053, 1055–56 (D.C.Cir.1991), *United States v. Morris,* 977 F.2d 617, 621–22 (D.C.Cir.1992), and *United States v. Derr,* 990 F.2d 1330, 1338 (D.C.Cir.1993)—the size and type of the gun, whether it was loaded, and the presence or absence of ammunition. Succumbing to "certainty's siren call," the majority would prohibit a reviewing judge from looking at any of these factors in deciding whether there was enough evidence in a particular trial record to justify an inference that the defendant used the guns to facilitate the drug offense.

Second: Because the majority's ruling in this *in banc* decision will predictably be promptly reduced to new jury instructions, it seems passing strange to say that the proximity and accessibility test minimizes interference with jury discretion. *See* Opinion ("Maj.Op.") at 111–12. What the majority is actually doing is artificially limiting the factors that the jury may legitimately consider when determining whether a defendant "used" a firearm during and in relation to the underlying drug offense. In so doing it is impermissibly curbing the jury's discretion to consider the totality of circumstances that might be relevant to that fact-bound determination.

Third: The new test is not only unduly rigid, it is not even clear. I cannot fathom how the accessibility prong, as defined by the majority, will work, or what indeed it adds to the minimal proximity test. It seems that whenever the guns are located proximately to the drugs, they must also be potentially accessible to the defendant *from the place the drugs are being stored.* Op. at 115. Thus if the guns and drugs are found together in a locked strongbox and the defendant is miles away, under the majority's test, the guns are arguably accessible to the defendant from the place where the drugs are stored and are being "used" to facilitate the possession of the drugs. To state the proposition is to reveal its illogic. Under the statute it is the defendant who must use the gun, so it is the accessibility of the gun to him at the time of the drug offense charged that is relevant, not the accessibility of the gun to a phantom defendant who is positioned where the drugs are. This latter definition of accessibility makes no sense whatsoever. Indeed, the majority's peculiar definition of accessibility renders their "use" test much looser than that endorsed by several other circuits, which at least focus on whether the guns were proximate to the defendant as opposed to merely accessible from the place where the drugs, drug paraphernalia, or drug proceeds are stored. *See, e.g., United States v. Theodoropoulos,* 866 F.2d 587, 597–98 (3d Cir. 1989) (guns located in trash can on back porch of apartment not proximate enough to defendant to fit within § 924(c)); *United States v. McKinnell,* 888 F.2d 669, 675 (10th Cir.1989) ("use" element of § 924(c)(1) met when defendant had "ready access" to firearm, which was located within easy reach of defendant).

Fourth: In those cases like Bailey's that involve the distribution or actual possession of drugs, application of the new proximity and accessibility test or the old relevant factors approach of *Bruce–Morris–Derr* will not likely make much difference. But in the trickier cases where the crime being charged is possession with intent to distribute and the defendant himself is not in the immediate vicinity of the scene where the drugs and guns are found, the majority's test can produce a ridiculous result. This was the situation in *Derr* and *Robinson.* In *Derr,* 990 F.2d at 1332, and *Robinson,* 997 F.2d 884, 885 (D.C.Cir.1993), the defendant was not even in the same room as the unloaded guns, which were secreted along with the drugs in a locked place (closet in *Derr,* footlocker in *Robinson* ). The crime was possession (constructive) with intent to distribute and the issue in both cases was whether the gun was being used to facilitate that possession. Although the majority would presumably find sufficient evidence to convict under § 924(c)(1) in both cases because the guns were proximate to the drugs and would have been accessible to each defendant once he or she reached the place where the drugs were being stored, I do not see how this result can be right. A defendant cannot have been "using" a gun to protect drugs when he was nowhere near the gun. A robber or competitor drug dealer who broke into the apartment would have been able to force the lock open without an iota of fear from the gun within because no one was there to use it.

I agree with Judge Williams that we must honor the ordinary meaning of words used by Congress, *see Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979); section 924(c) requires us to ask whether the gun was used to commit the drug trafficking crime for which the defendant was convicted, not whether the gun might have been used at some past or future time to commit some other past or future drug trafficking crime. *See Bruce,* 939 F.2d at 1055. To answer the right question, the

jury and a reviewing court needs access to all relevant information in order to replicate the real life scenario involving the guns, the drugs, and the defendant so that it can then decide if the defendant was in fact using the gun to facilitate the drug offense. The majority effectively leaves out the defendant altogether in its streamlined test; unfortunately, in so doing it distorts the plain meaning of the law, dispenses with logic, and invades jury discretion as well.

Finally, while I find Judge Williams' narrower interpretation of "use" quite persuasive, I cannot go so far as to agree that an actor who has intentionally placed a gun within easy access of his person in order to guard or to distribute drugs is not using the gun to facilitate the drug offense unless he openly brandishes, displays, or makes verbal threats about the gun. Where evidence of ready access to a gun by the defendant guarding or distributing the drugs exists, I think the jury can fairly draw the inference that such access is an intrinsic part of the criminal drug trafficking act. But conversely, I do not, like the majority, think it a fair inference that where the defendant has no such ready access to the gun, but instead is shown merely to be in constructive possession of the drugs which are located near the gun but away from the defendant, he is nonetheless using the gun to facilitate his possession or distribution. That I believe to be the principal difference between the other dissenters and myself, since I agree with them that "use" involves activity of some sort by a defendant who is in the immediate vicinity of the weapon, and not mere placement of the weapon near the drugs. That difference, however, is of sufficient import so as not to allow me to subscribe to Judge Williams' bright line rule any more than the majority's. Bright lines have a place in our jurisprudence but primarily with respect to what third parties like policemen or citizens can do without running afoul of the law. They are distinctly less useful in telling ju-

ries or judges what kind of evidence will suffice to show that a defendant is guilty of a generic crime that can be committed against a thousand different factual backdrops.

Because I believe that there was sufficient evidence to support Bailey's conviction for use in relation to actual possession of drugs with intent to distribute, *i.e.*, the gun in the trunk of the car was readily accessible to protect the drugs in the passenger compartment, but not Robinson's, *i.e.*, there was proof only of drugs and an unloaded gun in a locked trunk in a bedroom closet, I would affirm the first conviction and reverse the second. I would not adopt the majority's proximity and accessibility test but would instead continue to allow juries and judges to rely on all relevant factors to decide each case.

STEPHEN F. WILLIAMS, Circuit Judge, with whom SILBERMAN and BUCKLEY, Circuit Judges, join, dissenting:

Nearly all of our sister circuits say that mere possession of a firearm does not constitute "use" under 18 U.S.C. § 924(c). In the same breath, however, all—joined today by this court—allow conviction without evidence of the defendant's firing, brandishing, displaying or actively using the firearm in any way.[1] In joining the other circuits, the court undoubtedly simplifies our previous vague multifactored balancing test for review of § 924(c) cases for sufficiency of the evidence. And the majority is surely right that it is perfectly appropriate to overturn statutory interpretations where, as here, the precedent rejected is "fundamentally flawed", *Critical Mass Energy Project v. NRC*, 975 F.2d 871, 876 (D.C.Cir.1992) (en banc), and of course especially where, again as here, the precedent acts as "a positive detriment to coherence and consistency in the law ... because of inherent confusion created by an unworkable decision". *Id.* (quoting *Patterson v. Mc-*

---

1. Maj. Op. at 113–14. For a representative sampling, see *United States v. McFadden*, 13 F.3d 463, 465 (1st Cir.1994); *United States v. Breckenridge*, 782 F.2d 1317, 1322–23 (5th Cir.1986); *United States v. Lyman*, 892 F.2d 751, 753 (8th Cir.1989); *United States v. Harmon*, 996 F.2d 256, 258 (10th Cir.1993); *United States v. Poole*,

878 F.2d 1389, 1393 (11th Cir.1989). Other circuits are more honest. *United States v. Meggett*, 875 F.2d 24, 28 (2d Cir.1989) ("mere possession of a gun can constitute use"); *United States v. Torres–Rodriguez*, 930 F.2d 1375, 1385 (9th Cir.1991) (same).

*Lean Credit Union,* 491 U.S. 164, 173, 109 S.Ct. 2363, 2371, 105 L.Ed.2d 132 (1989)). In recent years, our cases have produced such inconsistency largely because we have failed to identify a clear definition of the term "use" of a firearm; it is that failure that has led to our frequent second-guessing of juries. In attempting to mend the incoherence of our previous approach by articulating a "proximity" plus "accessibility" test, however, the court has in effect diluted "use" to mean simply possession with a floating intent to use. In all but the rarest case, then, a defendant will be subject to punishment under § 924(c) if guilty of a drug trafficking offense and, while committing the offense, was in possession of a firearm. I think the wording, history and context of § 924(c) call for a different bright-line rule—one requiring active "use" rather than possession with a contingent intent to use.

\* \* \* \* \* \*

Section 924(c) imposes five additional years of punishment on

> Whoever, during and in relation to any crime of violence or drug trafficking crime . . . *uses* or carries a firearm.

18 U.S.C. § 924(c)(1) (emphasis added).

The word "use" in ordinary language normally implies activity. Cf. *United States v. McFadden,* 13 F.3d 463, 467 (1st Cir.1994) (Breyer, J., dissenting) ("the ordinary meanings of the words 'use' and 'carry' . . . connote activity beyond simple possession"). The majority asserts that a gun placed in one's drawer with an intent to use it in the event of an intruder is, "in common parlance, [ ] a gun 'used' for domestic protection". Maj.Op. at 114. This is possible in some contexts, but they are contexts in which the fact of "use" is *assumed.* Q: "What do you use the gun for?" A: "I use it to protect my family." In that hypothetical the answerer accepts the questioner's premise that the gun is in some sense used. But as the question assumes something that is not established, the answerer might well go back to the premise: A: "Actually, I've never had to use it. I keep it here in case of an intruder."

In support of its sweeping idea of the plain meaning of "use", the majority cites *Astor v. Merritt,* 111 U.S. 202, 4 S.Ct. 413, 28 L.Ed. 401 (1884). The case illustrates the importance of context. The plaintiff, William Astor, sought a refund of customs duties of $1,880 (in 1878 dollars) paid on clothing he had purchased in Europe for personal use but had not yet worn at the time he re-entered the United States. The statute provided an exemption for "[w]earing apparel in actual use and other personal effects (not merchandise), . . . of persons arriving in the United States", *id.* at 203, 4 S.Ct. at 413 (citing § 2505 of the Revised Statutes, p. 489, 2d ed.), and the government had prevailed below by arguing that "actual use" required that each particular item of clothing have been worn before importation. The Court instead found that the term "actual use" must be read in light of the basic distinction drawn by the statute between articles that are "personal effects of [the traveller], and not merchandise, and not for sale," *id.* at 214, 4 S.Ct. at 419, and thus sought a meaning for "actual use" that, "while it comports with the ordinary habits of passengers and travellers, will not open the door for fraud." *Id.* Any meaning that required past wearing was plainly incompatible with that purpose. No such incompatibility with statutory purpose is created by reading "use" in § 924(c) to require some sort of active use, as opposed to simple possession with a view to possible future use. Aside from *Astor*'s emphasis on context, its expansive interpretation of the word "use" to protect travellers hardly raises the same issues as does an expansive interpretation of a term in a criminal statute.

Part of that context consists of § 924(c)'s origins. The initial version, passed in 1968, reads as follows:

> Whoever—
>
> (1) uses a firearm to commit any felony which may be prosecuted in a court of the United States, or
>
> (2) carries a firearm unlawfully during the commission of any felony which may be prosecuted in a court of the United States,
>
> shall be sentenced to a term of imprisonment for not less than one year nor more than 10 years.

Pub.L. No. 90–351, 82 Stat. 233 (1968). In its 1968 form, the statute suggests that Con-

gress had active employment of a weapon in mind. The phrase "uses *to commit*" implies that the defendant derived actual service from the weapon in completing an unlawful act. This service might take the form of injuring one's opposition by firing it, intimidating opponents by displaying or brandishing it, or offering it in exchange to complete an unlawful commercial transaction. It does not, however, imply merely potential service—i.e., keeping it hidden from view, intending to use it only if a contingency should arise. For the gun in that instance has not actually been used to commit the crime; its only function is to make successful completion more probable under contingencies that have not arisen.

In 1984, Congress made two basic changes: it raised the sentence enhancement to exactly five years and it both broadened and narrowed the scope of predicate offenses from "any felony" to "any crime of violence". At the same time, it collapsed the two clauses into one, substituting the phrase "during and in relation to" the predicate crimes for the earlier provisions linking the firearm to the predicate crimes. The statute then read:

> Whoever, during and in relation to any crime of violence, including a crime of violence which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device, for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence, be sentenced to imprisonment for five years.

Pub.L. No. 98–473, 98 Stat. 2138 (1984). Congress gave two reasons for rewriting the statute, neither of which pertained to the scope of the term "use" or "carry". S.Rep. No. 225, 98th Cong., 2d Sess. 1, 312–13, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3490–91 ("Part D of title X represents a complete revision of subsection 924(c) *to overcome the problems with the present subsection discussed [below]*") (emphasis added). First, it sought to clarify the statute's approach to suspended and concurrent sentences. Second, it wished to overcome the Supreme Court's holdings in *Simpson v. United States,* 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d

70 (1978), and *Busic v. United States,* 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980), which negated the use of § 924(c) when another firearm penalty enhancement provision, such as that for armed robbery under 18 U.S.C. § 2113(d), applied. The government points to no evidence that in 1984 Congress sought to expand the meaning of "use". Moreover, Congress's adoption of the connective phrase "during and in relation to" could not have been intended to adjust for evolving problems of passive drug crimes; Congress only added drug trafficking offenses as predicate crimes in 1986. Pub.L. No. 99–308, 100 Stat. 456 (1986).

Moreover, the Senate Report relating to the 1984 change gave examples of use, both of them active: "pointing it at a teller or otherwise displaying it whether or not it is fired". S.Rep. No. 225, 98th Cong., 2d Sess. 1, 314, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3492. While these examples were not presented as exhaustive, they provide insight into the general class of behavior Congress had in mind. Even more indicative is the Senate Report's commentary on the "carry" provision which reads:

> Evidence that the defendant had a gun in his pocket but did not display it, or refer to it, could nevertheless support a conviction for "carrying" a firearm in relation to the crime if from the circumstances or otherwise it could be found that the defendant *intended to use* the gun if a contingency arose or to make his escape.... Moreover, the requirement that the firearm's use or possession be "in relation to" the crime would preclude its application in a situation where its presence played no part in the crime, such as a gun carried in a pocket and never displayed or referred to in the course of a pugilistic barroom fight.

*Id.* at 3492 n. 10 (emphasis added). The reference to intended use shows that Congress envisioned the "carry" provision to punish a defendant who did not "display" or otherwise actively use the firearm, but who had at least taken the active step of carrying the gun on a drug trafficking foray. Thus the Senate evidently saw "use" as a comparatively narrow term, with "carry" picking up cases of an alternative type of activity, where

the defendant did not actively "use" the weapon. The majority has turned this relation around, giving "use" such a broad meaning as to leave no apparent role for "carry".

Another element of § 924(c)'s context is the kindred provision, § 924(d), adopted in its original form in 1968, four months before the original § 924(c) "use or carry" provision. Pub.L. No. 90–351, 82 Stat. 233 (1968). The current version of § 924(d) provides for forfeiture of firearms "used in any knowing violation" of certain enumerated offenses (such as unlawful interstate transport and false statements in acquiring firearms), and of firearms "intended to be used" in other enumerated offenses (such as crimes of violence and drug trafficking crimes). 18 U.S.C. § 924(d)(1). Thus Congress, clearly quite alert to the distinction between firearms "used" in commission of a crime and merely "intended" for such use, provided for forfeiture *before* the weapon was used in drug trafficking, to nip the risk in the bud, apparently saving § 924(c)'s five years additional imprisonment for cases of actual use. "[U]sing a firearm" should not have a "different meaning in § 924(c)(1) than it does in § 924(d)". *Smith v. United States,* —— U.S. ——, ——, 113 S.Ct. 2050, 2057, 124 L.Ed.2d 138 (1993).

*Smith* also observed, to be sure, that "it is clear from § 924(d)(3) that one who transports, exports, sells or trades a firearm 'uses' it within the meaning of § 924(d)(1)". *Id.* The Court inferred this from the specific statutes as to which § 924(d)(1) creates forfeiture liability, including, for example, 18 U.S.C. § 922(a)(5) (unlicensed transfer of a firearm to a resident of a different state); *id.* § 922(*l*) (importation of firearms). See *Smith,* —— U.S. at —— n. *, 113 S.Ct. at 2057 n. *. All of these, some of which the Court generalized under the word "transport", will nearly always involve active manipulation of the firearm. Given § 924(c)'s explicit "carry" provision, the parallelism inferred by the Court in *Smith* may not be complete. That does little, I think, to undermine § 924(d)'s value in evidencing congressional alertness to the difference between "use" and intent to use.

Congress was also explicitly conscious of the relation between § 924(c) and 18 U.S.C. § 2113(d), which provides sharply increased penalties for one who, committing a bank robbery or theft in violation of 18 U.S.C. § 2113(a) or (b), "assaults any person, or puts in jeopardy the life of any person by the *use* of a dangerous weapon or device". 18 U.S.C. § 2113(d) (emphasis added). The Senate Report in 1984 mentioned § 2113(d) and made clear that it intended that some defendants might be subject to *both* enhancements. S.Rep. No. 225, 98th Cong., 2d Sess. 1, 314, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3492. In his brief before the Supreme Court in *McLaughlin v. United States,* 476 U.S. 16, 106 S.Ct. 1677, 90 L.Ed.2d 15 (1986), the Solicitor General of the United States used that history to sketch out a view of the intended meanings of "use" and "carry" in § 924(c). In *McLaughlin,* where the court held that an unloaded gun could be a "dangerous weapon" under that statute, the Solicitor General argued that weapons that are concealed and unmentioned do *not* suffice for conviction under the aggravated robbery statute (18 U.S.C. § 2113(d)) because "the robber has not 'used' the weapon to 'assault' anyone". Brief for the United States at 19, *McLaughlin* (No. 85–5189). He went on to press the point about the relative narrowness of the word "use" and the parallelism between § 924(c) and § 2113(d):

> *It appears that Congress is of the view that something more than the carrying of a gun is required to establish its use.* In response to this Court's decisions[,] *Simpson v. United States,* 435 U.S. 6 [98 S.Ct. 909, 55 L.Ed.2d 70] (1978), and *Busic v. United States,* 446 U.S. 398 [100 S.Ct. 1747, 64 L.Ed.2d 381] (1980), Congress amended 18 U.S.C. [§] 924(c) in 1984 to provide an additional penalty of five years' imprisonment for anyone who "uses or carries" a firearm during a crime of violence, including a "crime of violence which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device." Thus, the additional penalty of Section 924(c) now applies even though the defendant is convicted under a provision like Section 2113(d) that provides for an enhanced penalty for the use of a

dangerous weapon or device. In spelling that out in the legislative history, in fact, Congress used Section 2113(d) as an example, stating that a person convicted under Section 2113(d) would also be subject to five years' imprisonment under Section 924(c) if the dangerous weapon or device was a firearm. S.Rep. 98–225, 98th Cong., 1st Sess. 313–314 (1983). In its example, the Senate report referred to "using a gun * * * by pointing it at a teller or otherwise displaying it." *Id.* at 314 [1984 U.S.C.C.A.N. 3492]. In a footnote, the report noted that "evidence that the defendant had a gun in his pocket but did not display it, or refer to it, could nevertheless support a conviction for 'carrying' a firearm" under Section 924(c). S.Rep. 98–225, *supra*, at 314 n. 10 [1984 U.S.C.C.A.N. 3492]. Thus, Congress appeared to understand, as the language of Section 924(c) suggests, that there is a distinction between carrying a gun and using a gun. *Id.* at 19 n. 18 (emphasis added). Of course we owe no special deference to the views of the Solicitor General. Cf. *Crandon v. United States*, 494 U.S. 152, 177–78, 110 S.Ct. 997, 1011, 108 L.Ed.2d 132 (1990) (Scalia, J., concurring) (no deference owed to Department of Justice on interpretation of criminal statutes as they are "not administered by any agency but the courts"). Where he strongly presses a narrow reading of specific language in a criminal statute, however, it is certainly some evidence that that interpretation is a reasonable one, suggesting that, in the presence of another arguably reasonable reading, we are at least confronting a statutory ambiguity that under the rule of lenity should be resolved in favor of the narrow construction. In *United States v. Ray*, 21 F.3d 1134 (D.C.Cir.1994), we relied heavily on the Solicitor General's *McLaughlin* brief, saying, in our exposition of the word "use", "It is the brandishing or displaying, in other words, that the Court [in *McLaughlin*] said heightened the danger". *Id.* at 1137. We concluded that a defendant might "use" a concealed weapon (within the meaning of § 2113(d)) when he actively exploits its existence by *threatening* people with it. *Id.* at 1140–42. I would preserve the parallel treatment between "use" in both § 924(c) and § 2113(d), and require comparable activity.[2]

Nothing in *Smith* precludes limiting "use" to active employment. Its statement that "§ 924(c)(1)'s language sweeps broadly", —— U.S. at ——, 113 S.Ct. at 2054, means only that the proscribed use of firearms is not limited to the obvious or typical ways in which they may assist in the commission of a crime. Rather, a gun may be "used" regardless of whether it acts as an instrument to shoot, to bludgeon, or for exchange. That is, whether a firearm is "used" does not depend on whether it is employed in the customary way or a more creative way. But it does depend on whether the gun is employed at all, and nothing the Court said expands "use" beyond active employment. The observation that a gun "at least must 'facilitat[e] or ha[ve] *the potential* of facilitating'", *id.* at ——, 113 S.Ct. at 2059 (emphasis added), does not support an expanded definition of "use"; the Court made that point in reference to the separate "in relation to" requirement.

While the majority attempts to fine-tune the concept of facilitation (and thereby, use) through its twin guideposts of proximity and accessibility, the ultimate result is that possession amounts to "use" because possession enhances the defendant's confidence.[3] See Maj.Op. at 113, 116; *McFadden*, 13 F.3d at

---

2. The majority points out that the crime at issue in *McLaughlin* and *Ray*, bank robbery involving assault or jeopardizing a person's life, inherently involves force or the threat of force, and suggests that while reading "use" narrowly to cover only open brandishing or verbal allusions made sense there, a broader reading is necessary for a furtive crime such as possession of drugs. Maj. Op. at 115 n. 1. But the point of the Solicitor General's brief in *McLaughlin* was that Congress intended a consistent (and relatively narrow) reading of the word "use" in both contexts, § 2113(d) and the relatively generic § 924(c).

3. Occasionally, and quite understandably, a court taking the majority's view will forget even the veneer of a requirement of more than possession in connection with the predicate crime. "[Defendant] was also convicted of two or three counts of *use or possession* of a firearm in connection with drug trafficking crimes in violation of 18 U.S.C. § 924(c)(1)." *United States v. Windom*, 19 F.3d 1190, 1192 (7th Cir.1994) (emphasis added).

466. Had Congress intended that, all it need have mentioned is possession. Cf. 18 U.S.C. § 929(a) (additional punishment for one who "uses or carries a firearm *and is in possession* of armour piercing ammunition") (emphasis added). In this regard, the majority's test is either so broad as to assure automatic affirmance of any jury conviction or, if not so broad, is unlikely to produce a clear guideline. Thus, if the new standard proves anything less than a carte blanche for conviction, it will lead to the same sort of continuous and vacillating review of jury verdicts that our past jurisprudence has yielded and that the court so rightly deplores.

\* \* \* \* \* \*

Under my view of "use" there can be no serious argument that either Robinson or Bailey "used" the weapons as to which they were charged under § 924(c). But Bailey plainly transported his firearm in the trunk of his car, and the jury in his case was instructed to find whether the defendant had "used or carried" the weapon. Thus the question arises whether transportation of a firearm under these circumstances can sustain a conviction for carrying a firearm.

We have found "carry" to cover a gun carried, not on the defendant's person, but on that of a confederate and within easy reach of the defendant himself. *United States v. Joseph,* 892 F.2d 118, 126 (D.C.Cir.1989) (defendant at all times "within a few steps of, and usually no more than an arm's span from, the firearm"). We have also held that a jury could find that a defendant's control over confederates who carried weapons was enough to establish constructive possession, *United States v. Harrison,* 931 F.2d 65, 71 (D.C.Cir.1991), and thus upheld the conviction (which alternatively might have been sustained on a theory of aiding and abetting). The same understanding embraces the defendant who transports a weapon by motor vehicle *and* has as ready access to the weapon as he would if it were in his pocket. See, e.g., *United States v. Cardenas,* 864 F.2d 1528, 1533 (10th Cir.1989) (the gun "was within effortless reach of his hands, more accessible than if it were in his own pocket"). Both readings are consistent with the basic concept of carrying a weapon on one's person

(hand, pocket or holster), extended to catch the criminal who uses either confederates or mechanical transport (car, truck, ship or plane) to keep the firearm moving with him. In the motor vehicle case, the location of the weapon can render it as readily accessible as one held by an associate—if it is on hand for instant use, e.g., tucked under the driver's seat or resting on the dashboard or front passenger's seat.

I do not believe § 924(c) can properly be extended from these situations to that of the defendant who, like Bailey, transports the weapon in his car but is not shown to have had immediate access at any time while he was committing his drug trafficking offense. The effect would be to have § 924(c) embrace virtually every instance where a drug trafficker transports a weapon; in view of Congress's provision of a separate penalty in an adjacent section for anyone who "transports" a weapon with intent to commit a crime punishable by as much as a year's imprisonment, 18 U.S.C. § 924(b), that seems an improbable duplication. Cf. *Cardenas,* 864 F.2d at 1534–35 (rejecting equation of "carry" with "transport"). Rather, consonant with an active notion of "use", with the Senate Report's example of a weapon carried in the defendant's pocket, see *supra* at 122, and with the principle of the "constructive possession" cases that the defendant may use the gun on a moment's notice, the word "carry" must entail immediate availability. Thus, the gun locked in the trunk of Bailey's car was not accessible enough to support a conviction for carrying the gun during and in relation to his possession with intent to distribute drugs.

That is not to say that a defendant arrested with a gun in his trunk may never be convicted under § 924(c). Realistically, drug dealers often operate out of car trunks, returning from a distribution station to replenish drugs, deposit cash or retrieve a weapon. If the government presents evidence that the defendant handled the weapon by placing it in the car "during and in relation to" action taken in the commission of a predicate offense, that evidence would be sufficient to sustain a conviction. Alternatively, there may be cases where the government can

prove that the defendant bought the firearm such a short time before arrest on the drug trafficking offense as to sustain an inference (beyond a reasonable doubt) that he must have been handling it simultaneously with commission of the drug offense. But as a gun can obviously rest in a trunk for a long period, the mere fact of a gun's presence there, coupled with the defendant's use of the car for drug distribution, does not give rise to an inference of the necessary simultaneity of immediate access to the weapon (in a context of moving it about) and commission of the predicate crime. As there appears to be no evidence in the record against Bailey beyond his drug trafficking and the location of the weapon in the trunk, his conviction cannot be sustained on such a ground.

\* \* \* \* \* \*

The majority's expansive view of "use" virtually emasculates the role of the term "carry" in the statute. If "use" is understood to require real activity (such as brandishing, displaying or threatening), and "carry" to require conveying the firearm, coupled with immediate ability to put it to active use, both terms will have a meaningful yet distinct content, consistent with the language, context and legislative history of § 924(c).

\* \* \* \* \* \*

I would reverse the convictions of both Bailey and Robinson.

SILBERMAN, Circuit Judge, dissenting:

I think it most unfortunate that the majority opinion is directed, virtually entirely, at our past precedent dealing with the difficult question presented. We agreed, through the *en banc*ing of these cases, that we needed to think harder about § 924(c) to see if we could arrive at a more coherent standard firmly rooted in the statute. The standard advanced in Judge Williams' lucid opinion represents the product of that rethinking—at least on the part of the dissenters—and I would have thought that the majority might have marshaled the effort to confront fully the analysis set forth in the dissent.